**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CELINA QUINONES and BARRIE DEMPSEY, individually and as the representatives of a class of similarly-situated persons,

*Plaintiffs,*

v.

DATANYZE, LLC,

*Defendant.*

Case No.: 1:25-cv-01977-RMR-SBP

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Celina Quinones and Barrie Dempsey ("Plaintiffs"), by and through their attorneys, bring this First Amended Complaint ("FAC") on behalf of themselves and all other persons similarly situated and allege the following against Defendant Datanyze, LLC ("Datanyze" or "Defendant"):

## NATURE OF THE ACTION

1. Plaintiffs and members of the proposed class (the "Class" or "Class Members") seek statutory damages, an injunction, and other relief from Datanyze for violations of the Colorado Prevention of Telemarketing Fraud Act ("PTFA"), Colo. Rev. Stat. § 6-1-304.

2. On May 27, 2005, HB05-1288[1] was signed into law, amending PTFA to prohibit listing a cellular telephone number in a directory for a commercial purpose

[1] Colorado House Bill 05-1288, Final Act, https://www.leg.state.co.us/clics2005a/csl.nsf/fsbillcont3/1BB0D3E00348AC6987256F90007C20C7?open&file=1288_enr.pdf.

without affirmative consent. *See* Colo. Rev. Stat. § 6-1-304(4)(a)(I).[2] The amendment took effect on September 1, 2005. *Id*.

3. This amendment to PTFA was designed to protect the privacy of cellular telephone numbers, as demonstrated by former Colorado State Representative Mark Cloer's public comments on the provision: "Most people view their cell phones as private. They give out the number to friends and family and some colleagues. When their cell phone rings, they expect it to be important. Most users would find a sales call to be an intrusion . . . ."[3]

4. The Colorado legislature enacted subsection (4) of PTFA to specifically address privacy concerns of cellular telephone users and protect cellular telephone users from the misappropriation of their personal information, in keeping with the overall purpose of PTFA:

> The general assembly hereby finds, determines, and declares that the use of telephones for commercial solicitation is rapidly increasing; that this form of communication offers unique benefits, but entails special risks and poses the potential for abuse; that the general assembly finds that the widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly, homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest; and, therefore, that the general welfare of the public and the protection of the integrity of the telemarketing industry requires statutory regulation of the commercial use of telephones.

Colo. Rev. Stat. § 6-1-301.

---

[2] Colorado House Committee on Business Affairs and Labor, Bill Summary for HB05-1288, https://www.leg.state.co.us/CLICS2005A/commsumm.nsf/IndSumm/574E34C489356ADA87256FB100612E60?.

[3] 9News, "Legislative Library: Feb. 23, 2005," https://www.9news.com/article/news/local/politics/legislative-library-feb-23-2005/73-344789916.

5. Colo. Rev. Stat. § 6-1-304(4)(a) thus provides: "On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly: (I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing . . . ."

6. Datanyze is a Delaware limited liability company that provides an internet-based business search platform for sales and marketing professionals. For this platform, Datanyze created a searchable directory of business professionals, listing those professionals' names, contact information, and, most pertinent here, their cellular telephone numbers. Many of these individuals reside in Colorado.

7. Datanyze provides access to its directory for a subscription fee and also uses the directory for marketing the subscriptions. In other words, Datanyze uses its directory, and the lists of cellular numbers contained therein, for commercial purposes.

8. Plaintiffs and the Class have no relationship with Datanyze. More importantly, Plaintiffs and the Class never provided Datanyze with affirmative consent to list their cellular telephone numbers in its directory.

9. Despite failing to obtain affirmative consent from Plaintiffs and the Class, Datanyze nevertheless listed their cellular telephone numbers in its directory for commercial purposes in violation of PTFA.

10. Plaintiffs bring this action seeking an order (i) declaring that Datanyze's conduct violates PTFA, (ii) requiring that Datanyze cease the unlawful activities described herein; and (iii) awarding Plaintiffs and the Class statutory damages in the

amount of at least $300 and not more than $500.

## PARTIES

11. Plaintiff Celina Quinones is, and at all times relevant to this action has been, a citizen of Colorado residing in Thornton, Colorado.

12. Plaintiff Barrie Dempsey is, and at all times relevant to this action has been, a citizen of Colorado residing in Denver, Colorado.

13. Datanyze, LLC is incorporated under the laws of Delaware and maintains its corporate headquarters in Durham, North Carolina. Datanyze has created a sales-intelligence platform that enables its users to search through its online directory and the list of cellular numbers contained therein, including the cellular telephone numbers of Plaintiffs and thousands of other Coloradans.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action in which the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs; there are over 100 members in the putative class; and at least one Plaintiff is a citizen of a different state than at least one Defendant, satisfying CAFA's minimum diversity requirement.

15. This Court has personal jurisdiction over Datanyze because Datanyze regularly transacts business in Colorado and a substantial part of the events giving rise to the claims asserted herein occurred in Colorado. Datanyze's wrongful conduct—knowingly listing the cellular telephone numbers of thousands of Coloradans in its

directory, including Plaintiffs, without requesting or receiving those individuals' affirmative consent—caused injury in Colorado and to Colorado residents.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Datanyze conducts significant business transactions within this District and because the wrongful conduct giving rise to this action occurred in and was directed to this District. Venue is additionally proper because Plaintiffs reside in Thornton, Colorado, and Denver, Colorado, which are both located within this District.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### Datanyze's Directory

17. Datanyze is a data broker – a company that "collect[s] consumers' personal information and resell[s] or share[s] that information with others[.]"[4] Notably, Datanyze is registered as a data broker in California[5] and with the Texas Secretary of State,[6] which confirms the commercial nature of Datanyze's data operations. As a registered data broker, Datanyze acknowledges that it collects personal information about consumers with whom it does not have a direct relationship, and it sells or licenses that information for commercial purposes.

---

[4] FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf, last visited on October 6, 2025.

[5] Data Broker Registration for Datanyze, Office of the Attorney General of California, https://oag.ca.gov/data-broker/registration/537422, last visited on October 6, 2025.

[6] Registry of Registered Data Brokers, Texas Secretary of State, https://texas-sos.appianportalsgov.com/data-broker-registry, last visited on October 6, 2025.

18. Datanyze markets itself as a business search platform that enables users to connect to business-to-business sales prospects for their own sales, marketing, and recruiting activities.[7] The platform is accessible at Datanyze's website, www.datanyze.com, or through a Google Chrome extension.

19. For its platform, Datanyze engages in mass collection of personal information regarding business people and companies to create profiles of them. The resulting directory[8] is then made available to users of the platform. Information that may be provided in a person's profile includes name, email addresses, job title and department, phone number (general or direct business numbers, faxes, and ***mobile numbers***), company name, postal address of company and business-related postal address of the person, employment history, and education history.

20. Datanyze claims that its directory contains over 120 million people profiled with 84 million email addresses and 63 million direct dial numbers.

21. Datanyze knows that it lists cellular telephone numbers of Coloradans in its directory. Indeed, on its website, Datanyze states that users "[c]an get information,

---

[7] Information regarding Datanyze was found at its website, www.datanyze.com, last visited on September 30, 2025.

[8] On its website, Datanyze refers to the collection of profiles in its database as a directory – "Datanyze creates profiles of business people and companies, which we call "**Professional Profiles**" and "**Business Profiles**," respectively. Once we have collected Business Information about a person or company, we may combine multiple data points regarding a single person or company into a Professional or Business Profile. The resulting directory of Professional and Business Profiles (the "**Directory**") is then made available to the users of the Site and our customers and strategic partners." www.datanyze.com/privacy-policy (emphasis in original), last visited on September 30, 2025. *See also*, Datanyze, "What is Datanyze?", https://www.datanyze.com/help-center/what-is-datanyze?utm_source=chatgpt.com ("Through **Datanyze's Directory** pages, users can also tap into featured icebreakers related to what's happening in a prospect's world.") (emphasis added), last visited on September 30, 2025.

including email addresses, direct dial and ***mobile numbers*** directly from LinkedIn profiles and company websites, without leaving your browser"[9] (emphasis added). And Datanyze does, in fact, provide search results for Coloradans that also list their cellular telephone numbers, labeled with a "mobile" tag.

22. As stated, Datanyze's platform can be accessed by users at its website. There, the user can find and filter information contained in Datanyze's directory. For instance, a user can search a company and find information about it and its employees. The user can then select a specific employee to view contact information of that person, including his or her cellular number, as stored on the directory.

23. Information on the platform can also be accessed by using Datanyze's Google Chrome extension in conjunction with LinkedIn. LinkedIn is the world's largest professional network, with more than one billion members.[10]

24. After a user has downloaded Datanyze's Google Chrome extension, the Datanyze icon appears as a tab on LinkedIn's webpage. When a Datanyze user views an individual member on LinkedIn, the user can click on the Datanyze tab to see whether Datanyze has a profile of that member in its directory. If a profile exists, the user can view the profile for additional contact information, such as mobile phone numbers.

25. Thus, for instance, as shown in the image below, when a Datanyze user views a Colorado resident's LinkedIn profile, the Datanyze browser extension appears

---

[9] https://www.datanyze.com/, last visited on September 30, 2025.

[10] Information regarding LinkedIn found at its website, www.linkedin.com, last visited on September 30, 2025.

on the right-hand side of their browser window, quickly extracting and revealing the individual's contact details, including their mobile, *i.e.* cellular, telephone number.




26. The Google Chrome extension also allows the user to search and connect with prospects at scale. As described by Datanyze, "[w]hen [a user] click[s] to see all employees for a company on LinkedIn, Datanyze provides all of their contact information directly on the page."

27. Through both its website access and Google Chrome extension, Datanyze's platform allows users to select individual profiles in the directory and download the corresponding data as an Excel or .csv file. This allows users to create their own contact lists from the directory on the platform. Once downloaded as an Excel or .csv file, a user can conduct sophisticated searching and filtering of the data, including running targeted searches for contacts located in Colorado, for contacts with a listed cellular telephone number, and for contacts satisfying each criterion.

28. Before Datanyze users, *i.e.*, customers/prospective customers, are allowed to view an employee profile from the directory, they are required to enter into a paid

subscription with Datanyze or sign up for a 90-day free trial. The profiles in the directory are not visible without first signing up for a free trial or entering into a paid subscription.

29. Datanyze provides limited free access to its services for 90 days through its "Nyze Lite" trial. The "Nyze Lite" trial provides users 10 credits per month, and each credit allows a user to reveal one full contact record in Datanyze's directory. Datanyze then has a series of paid "Nyze Pro" subscriptions to its services, which allow customers to access more credits and information about individuals—including residents of Colorado—at a cost.

30. Datanyze's charges $29 per month (or $21 per month if billed yearly) for its "Nyze Pro 1." This option provides customers with 960 credits per year. Datanyze's "Nyze Pro 2" services costs $55 per month (or $39 per month if billed yearly) and provides customers with 1,920 credits per year.[11] A copy of the pricing is provided below:




[11] *See* Datanyze, "Plans & Pricing," https://www.datanyze.com/pricing, last visited on September 30, 2025.

31. Datanyze uses the 90-day free trial, along with the limited access to employee profiles, to advertise and convince prospective customers to purchase its monthly subscription services, whereby those customers can access and retrieve employee profiles on any individual in Datanyze's directory. In other words, the free trial, together with the limited free profile access, is part of Datanyze's overall effort to sell its monthly subscriptions.

32. Further, Datanyze's entire business model is based on selling access to the profiles in its directory to sales professionals. To enhance the appeal of this access, Datanyze includes cellular telephone numbers of Coloradans and others with the lists of profiles in its database, which is paid for through subscription costs.

33. Datanyze has a commercial purpose in collecting and listing the cellular telephone numbers of Plaintiffs and thousands of other Coloradans—both for free and under a paid subscription—either as advertising for its platform and directory or as a service exchanged for a paid subscription for use of the platform and access to the directory.

**<u>Datanyze's Listing of Cellular Telephone Numbers in its Directory Harms Coloradans</u>**

34. Datanyze's misappropriation of Plaintiffs' and thousands of other Coloradans' cellular telephone numbers thus deprives these individuals from the real, quantifiable value of their data and deprives them of their rights under PTFA.

35. There are additional harms inherent in having one's personal data misappropriated by online directories and data broker sites. Phone scams are one

common example, in which scammers employ various methods to cheat people out of money by taking their payment information and other personal details over the phone. The FTC warns consumers about numerous categories of common phone scams, including: (1) impersonator scams that involve scamming individuals by pretending to be a government agency or a loved one; (2) debt relief and credit repair scams, in which scammers offer to lower credit card interest rates, fix credit scores, or forgive student loans; (3) business and investment scams, in which scammers promise to help individuals start their own businesses or guarantee profits from investments; (4) charity scams, in which scammers pose as real charities and ask for fraudulent donations for disaster relief or local law enforcement; (5) extended car warranty scams; (6) “free trial” scams; (7) loan scams; (8) prize and lottery scams; and (9) travel scams and timeshare scams.[12]

36. Scams and the misappropriation of personal data extracted from the Internet have been directly linked to people search sites and directories like the one maintained by Datanyze.[13] And beyond financial scams, the misappropriation of personal data and contact information can even potentially increase the risk of

---

[12] FTC Consumer Advice, “Phone Scams,” https://consumer.ftc.gov/articles/phone-scams.

[13] *See, e.g.*, Consumer Reports, “Evaluating People-Search Site Removal Services,” https://innovation.consumerreports.org/Data-Defense_-Evaluating-People-Search-Site-Removal-Services-.pdf (“People-search sites put ordinary people at risk of fraud, identity theft, scams, and even stalking and other forms of harassment.”); Fox News, “The dangerous intersection of people search sites and scams,” https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams (outlining how people search sites can enable scammers to find victims, create detailed profiles of individuals, and launch targeted phishing attacks to probe for sensitive information).

victimization by stalkers and perpetrators of domestic violence and other forms of abuse.[14]

37. A Federal Trade Commission ("FTC") report on Data Brokers succinctly outlines the many risks inherent in misappropriating personal information of consumers, as Datanyze has done here:

> There are a number of potential risks to consumers from data brokers' collection and use of consumer data . … [T]hey may facilitate the sending of advertisements … which some consumers may find troubling and which could undermine their trust in the marketplace. Moreover, … people search products can be used to facilitate harassment, or even stalking, and may expose domestic violence victims, law enforcement officers, prosecutors, public officials, or other individuals to retaliation or other harm.[15]

38. Indeed, Coloradans regularly suffer abuse from parties who misuse cellular telephone numbers. The Federal Trade Commission's FY2024 National Do Not Call Registry Data Book shows that Colorado ranks No. 10 among all states in complaints per 100,000 individuals submitted to the registry (41,173 complaints total; 719 complaints per 100,000 individuals). The majority of complaints from Colorado are complaints about robocalls, and the leading complaint topic reported by Coloradans is "Imposters"—calls in which a caller fraudulently purports to be someone else.[16]

---

[14] *See, e.g.*, Voices of Women, "The Dangers of People Search Sites," https://vownow.org/2020/10/the-dangers-of-people-search-sites/; FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

[15] FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

[16] Fed. Trade Comm'n, The National Do Not Call Registry Data Book (Nov. 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/DNC-Data-Book-2024.pdf.

39. The individual harms described above are exacerbated by the growing technical capabilities of criminals who have developed the ability to contact cellular numbers at an unprecedented scale. In recent years, criminal operators have deployed so-called "SIM farms"—large collections of centrally managed SIM cards housed in SIM boxes and controlled by servers—to carry out high-volume spam, fraud, and other attacks that directly harm individuals. By way of example, the U.S. Secret Service recently identified a New York-area operation that a law enforcement source reported "could be used to send approximately 30 million text messages per minute, meaning it could anonymously text the entire United States in around 12 minutes."[17]

40. Access to cellular telephone numbers in conjunction with other personally identifying information enables devastating forms of fraud. One serious emerging threat is "SIM swapping," in which criminal actors impersonate a victim to trick a mobile carrier into transferring the victim's telephone number to a SIM card controlled by the attacker. Once the SIM is reassigned, the attacker receives the victim's calls and text messages and can intercept one-time passcodes or account-recovery messages sent via SMS. Since many online services reply on SMS-based authentication or password-reset links, a successful SIM-swap enables attackers to bypass those protections and take control

[17] Andy Greenberg, Lily Hay Newman & Matt Burgess, " 'SIM Farms' Are a Spam Plague. A Giant One in New York Threatened U.S. Infrastructure, Feds Say," WIRED (Sept. 23, 2025), https://www.wired.com/story/sim-farm-new-york-threatened-us-infrastructure-feds-say/.

of email, financial, and other online accounts, causing significant financial loss and invasion of privacy.[18]

41. Moreover, vulnerable populations, such as elderly individuals and individuals with disabilities, are particularly susceptible to being targeted and taken advantage of by phone scammers. The FBI estimates that millions of elderly Americans fall victim to some type of financial fraud each year,[19] and a 2024 FTC report found that "[t]he amount of money victims lose through fraud increases with age," with adults in their 70s losing a median of $1,000 per instance of fraud, more than double the $497 median loss across all ages.[20] According to the National Council on Aging, "[f]raudsters and con artists tend to go after older adults," and three out of the five most common fraudulent schemes perpetrated against older Americans involve phone scams.[21] The Social Security Administration itself describes Social Security fraud, in which scammers use

[18] Fed. Bureau of Investigation, Internet Crime Complaint Ctr., Criminals Increasing SIM Swap Schemes to Steal Millions of Dollars from U.S. Public, Alert No. I-020822-PSA (Feb. 8, 2022), https://www.ic3.gov/PSA/2022/PSA220208.

[19] FBI, "Elder Fraud," https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/elder-fraud.

[20] AARP, "$12.5 Billion Reported Lost to Scams and Fraud in 2024, Older Adults Hit Hard," https://www.aarp.org/money/scams-fraud/older-adults-ftc-fraud-report.html#:~:text=The%20FTC%20found%20that%20among,ages%20in%202024%20was%20%24497.

[21] National Council on Aging, "The Top 5 Financial Scams Targeting Older Adults," https://www.ncoa.org/article/top-5-financial-scams-targeting-older-adults/ (listing three types of common fraudulent schemes involving phone calls: the "grandparent scam," "financial services scam," and "government impersonation scams").

targeted tactics—including phone calls—to deceive elderly and disabled individuals into providing sensitive information or money as "widespread."[22]

42. As with other age groups, the ownership rate of cellular telephones among elderly Americans is increasing. A November 2024 Pew Research study found that 98% of Americans owned a cellular telephone of some kind, up from 67% in December 2005, shortly after PTFA was amended to include subsection (4).[23] As of 2024, 94% of Americans aged 65 and older used a cellular telephone.[24]

43. Studies indicate that Americans are highly concerned about the security risks associated with the misappropriation of their personal data. According to a 2023 Pew Research poll, most Americans are concerned about how companies and the government use their information.[25] Americans increasingly state that they do not understand what companies are doing with their data (67% say they "understand little to nothing about what companies are doing with their personal data"), and most Americans believe "they have little to no control over what companies [73%] and the government [79%] do with their data."[26]

---

[22] Social Security Administration, "Social Security and Scam Awareness," https://blog.ssa.gov/social-security-and-scam-awareness/.

[23] Pew Research Center, "Mobile Fact Sheet," https://www.pewresearch.org/internet/fact-sheet/mobile/.

[24] *Id.*

[25] Pew Research, "How Americans View Data Privacy," https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[26] *Id.*

## <u>Facts Relating to Celina Quinones</u>

44. Quinones is a citizen and resident of Colorado and maintains a cellular telephone number.

45. In May 2025, Quinones discovered that her cellular number was listed by Datanyze in its online directory, available at www.datanyze.com.

46. Datanyze created a profile of Quinones for its directory, accessible at Datanyze's website and through its Google Chrome extension. Quinones's profile includes her name, profession, job title, location, email address, link to her LinkedIn profile, and telephone numbers. Most pertinent here, Quinones's profile contains her cellular telephone number, which was tagged as a "mobile" number. See image below:




47. Datanyze uses access to Quinones's profile, which includes her cellular telephone number, to charge users of its platform for access to its database and also for advertising purposes.

48. Datanyze knowingly listed Quinones's cellular telephone number in its database. Indeed, as shown in the image above, Quinones's cellular telephone number is explicitly tagged as a "Mobile" number on Datanyze's platform.

49. Quinones does not subscribe for access to Datanyze directory. In fact, Quinones has no relationship with Datanyze whatsoever.

50. Datanyze never requested—and Quinones never provided—affirmative consent to the listing of her cellular telephone number by Datanyze, by written, oral, electronic, or other means.

51. Quinones had no reasonable ability to discover Datanyze's use of her cellular telephone number until shortly before filing the present action.

52. Quinones has privacy and property interests in her cellular telephone number. Quinones has the right to exclude companies like Datanyze from using or taking advantage of these interests without her consent.

53. Datanyze injured Quinones by knowingly using her cellular telephone number for its own commercial purposes without consent, the very harm PTFA was meant to prevent.

**Facts Relating to Barrie Dempsey**

54. Dempsey is a citizen and resident of Colorado and maintains a cellular telephone number.

55. In May 2025, Dempsey discovered that her cellular number was listed by Datanyze in its online directory, available at www.datanyze.com.

56. Datanyze created a profile of Dempsey for its directory, accessible at Datanyze's website and through its Google Chrome extension. Dempsey's profile includes her name, profession, job title, location, email address, link to her LinkedIn profile, and telephone numbers. Most pertinent here, Dempsey's profile contains her cellular telephone number, which was tagged as a "mobile" number. See image below:




57. Datanyze uses access to Dempsey's profile, which includes her cellular telephone number, to charge users of its platform for access to its database and also for advertising purposes.

58. Datanyze knowingly listed Dempsey's cellular telephone number in its database. Indeed, as shown in the image above, Dempsey's cellular telephone number is explicitly tagged as a "Mobile" number on Datanyze's platform.

59. Dempsey does not subscribe for access to Datanyze directory. In fact, Dempsey has no relationship with Datanyze whatsoever.

60. Datanyze never requested—and Dempsey never provided—affirmative consent to the listing of her cellular telephone number by Datanyze, by written, oral,

electronic, or other means.

61. Dempsey had no reasonable ability to discover Datanyze's use of her cellular telephone number until shortly before filing the present action.

62. Dempsey has privacy and property interests in her cellular telephone number. Dempsey has the right to exclude companies like Datanyze from using or taking advantage of these interests without her consent.

63. Datanyze injured Dempsey by knowingly using her cellular telephone number for its own commercial purposes without consent, the very harm PTFA was meant to prevent.

## CLASS ALLEGATIONS

64. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals (the "Class" or "Class Members"), defined as follows:

> All persons who were Colorado residents on or before three (3) years prior to the filing of this complaint whose cellular telephone numbers where listed by Datanyze in its for-profit directory.

65. The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Datanyze, Dantanyze's subsidiaries, parents, successors, predecessors, and any entity in which Datanyze or its parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or

otherwise released; (v) Plaintiffs' counsel and Datanyze's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

66. Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the action.

67. ***Numerosity*** **(Fed. R. Civ. P. 23(a)(1)).** Members of the Class are so numerous that joinder of all Class Members is impractical. Based on refined searches conducted on the Datanyze directory, the number of persons in the class is estimated to be in the thousands. Additionally, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.

68. ***Commonality*** **(Fed. R. Civ. P. 23(a)(2))**. A well-defined community of interest exists in the questions of law and fact involved in this action. Questions of law and fact common to the members of the Class that predominate over questions affecting only individual Class Members include, but are not limited to, the following:

(a) Whether Datanyze violated Colo. Rev. Stat. § 6-1-304(a)(I); and

(b) Whether Plaintiffs and Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of the suit, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

69. ***Typicality*** **(Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, had their cellular telephone numbers collected and listed on the Datanyze directory for a commercial purpose;

Datanyze collected and listed Plaintiffs' cellular telephone numbers on the directory without Plaintiffs' affirmative consent (either written, oral, electronic, or by other means); and Datanyze's misappropriation of Plaintiffs' personal data (including its economic value) was at the expense of Plaintiffs' PTFA privacy rights.

70. ***Adequacy*** **(Fed. R. Civ. P. 23(a)(4).** Plaintiffs will adequately safeguard the interests of the Class Members, as Plaintiffs' interests align with, and do not conflict with those of the Class. Plaintiffs' counsel has experience in handling class action litigation, including consumer privacy. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

71. ***Injunctive and/or Declaratory Relief*** **(Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, Datanyze has acted on grounds generally applicable to the proposed Class such that declaratory and final injunctive relief are appropriate with respect to the Class.

72. ***Predominance and Superiority*** **(Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

(a) Proof of Datanyze's liability on Plaintiffs' claims will also prove liability for the claims of the Class without the need for individualized proceedings;

(b) Evidence regarding defenses or any exceptions to liability that Datanyze may assert and attempt to prove will come from Datanyze's records and will not require individualized or separate inquiries or proceedings;

(c) Datanyze has acted and is continuing to act pursuant to common policies or practices in the same or similar manner with respect to all Class Members;

(d) The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Datanyze economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs without the risk of inconsistent judgments;

(e) This case is inherently manageable as a class action in that: (i) Datanyze's records will enable Plaintiffs to readily identify Class Members and establish liability and damages; (ii) liability and damages can be established for Plaintiffs and the Class with the same common proofs; (iii) a class action will result in an orderly and expeditious administration of claims, fostering economies of time, effort, and expense; (iv) a class action will contribute to uniformity of decisions concerning Datanyze's practices; and (v) as a practical matter, the claims of each Class Member are likely to go unaddressed absent class certification.

## CAUSE OF ACTION

### Violation of the Prevention of Telemarketing Fraud Act
### (Colo. Rev. Stat. § 6-1-304(4)(a)(I))
### (On Behalf of Plaintiffs and the Class)

73. Plaintiffs incorporate the above paragraphs by reference as if fully stated herein.

74. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Datanyze.

75. Colo. Rev. Stat. § 6-1-304(4) provides:

(a) On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly:

(I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing[.]

76. Datanyze knowingly lists Plaintiffs and other Coloradans' cell phone numbers in its directory.

77. Datanyze's platform is a directory. A "directory," according to Oxford Learner's Dictionaries, is a "book or electronic resource containing lists of information . . . for example people's phone numbers or the names and addresses of businesses in a particular area."[27] On its website, Datanyze explicitly states that "Datanyze users can access contact and company data directly from the places they prospect most," they can "tag contacts and companies to automatically create segmented lists," and when a user "click[s] to see all employees for a company on LinkedIn, Datanyze provides all of their contact information directly on the page."[28] In other words, Datanyze's platform is a resource containing a list of information that includes individuals' cellular telephone numbers, among other personal details. Moreover, Datanyze itself describes its book of profiles as a directory in multiple locations on its website.

[27] Oxford Learner's Dictionaries, "Directory," https://www.oxfordlearnersdictionaries.com/definition/english/directory; *see also* Cambridge, "Directory," https://dictionary.cambridge.org/us/dictionary/english-italian/directory#google_vignette (defining a "directory" as "a book or list of names and numbers").

[28] Datanyze, "Features," https://www.datanyze.com/features.

78. Datanyze lists Plaintiffs' cellular telephone numbers in its directory for two distinct commercial purposes: first, as part of a marketing plan during the free trial to entice potential customers to enter into subscriptions for access to its directory; and second, as part of the product it provides access to users for a cost.

79. Datanyze never requested the "affirmative consent, through written, oral, or electronic means" from Plaintiffs or other Class Members to list their cellular telephone numbers. Colo. Rev. Stat. § 6-1-304(4)(a)(I). Rather, Datanyze routinely lists the cellular telephone numbers of Coloradans they have never engaged with, have had no connection or relationship to, and who are completely unaware of Datanyze.

80. Dantanyze's misappropriation of Plaintiffs' and Class Members' personal data (including its economic value) comes at the expense of Plaintiffs' and Class Members' privacy rights under PTFA. Datanyze's conduct deprived Plaintiffs and Class Members of the real, quantifiable value of their data, and it exposed Plaintiffs and Class Members to elevated risks of harassment, stalking, scams, identity theft, and unwanted telemarketing calls.

81. Thus, on behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class; (3) damages, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars ($300) and not more than five hundred dollars ($500) for each first offense, and at least five hundred dollars ($500) and not more than one thousand dollars ($1,000) for each second or subsequent offense; and (4) reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(a)(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that this Court grant judgment against Datanyze as follows:

(a) An order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b) An order declaring that Datanyze's conduct, as described above, violates Colo. Rev. Stat. § 6-1-304(4)(a)(I) (Colorado's "Prevention of Telemarketing Fraud Act" or "PTFA");

(c) An order awarding Plaintiffs and Class Members statutory damages pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars ($300) and not more than five hundred dollars ($500) for each first offense, and at least five hundred dollars ($500) and not more than one thousand dollars ($1,000) for each second or subsequent offense;

(d) An order awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including *inter alia*, an Order requiring Datanyze to comply with PTFA;

(e) An order awarding Plaintiffs and the Class their reasonable attorney's fees and expenses and costs of suit pursuant to Colo. Rev. Stat. § 6-1-305(1)(c);

(f) An order awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

(g) An order awarding such other and/or further relief as the Court may deem just and proper.

Dated: October 7, 2025

Respectfully submitted,

Celina Quinones and Barrie Dempsey, individually and as the representatives of a class of similarly-situated persons

*/s/ Patrick J. Solberg*
Patrick J. Solberg
Brian J. Wanca
Wallace C. Solberg
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
psolberg@andersonwanca.com
bwanca@andersonwanca.com
wsolberg@andersonwanca.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 7, 2025, a true and correct copy of the foregoing First Amended Class Action Complaint was e-filed and served on all counsel of record using the Court's CM/ECF system.

*/s/ Patrick J. Solberg*